IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,574


STATE OF KANSAS,
*Appellee*,

v.

TERRY D. HORTON JR.,
*Appellant*.


SYLLABUS BY THE COURT


1.

Before a court may admit double hearsay, a statutory exception must apply to each hearsay statement.


2.

An appellate court may independently consider whether a prosecutor erred even if the lower court sustained an objection to the prosecutorial act.


3.

A prosecutor does not necessarily shift the burden of proof by comparing a defendant's trial statement with earlier inconsistent statements.


Appeal from Wyandotte District Court; COURTNEY MIKESIC, judge. Oral argument held December 15, 2025. Opinion filed April 24, 2026. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, argued the cause and was on the briefs for appellant.

*Garett C. Relph*, deputy district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, C.J.: A jury convicted Terry D. Horton Jr. of aggravated battery and felony murder in connection with the injuries of Cedrick Scott and the death of Printara Jackson. We affirm his convictions.

FACTUAL AND PROCEDURAL HISTORY

On July 17, 2022, Printara Jackson was found dead by gunshot wound on a porch at the Gateway apartments in Kansas City. Cedrick Scott was injured and located close to Jackson's body. Scott was taken immediately to the hospital, where he was operated on and survived.

The State charged Terry Horton with aggravated battery for Scott's injuries and felony murder for the death of Jackson. It theorized that Horton intentionally shot Scott for physically hurting Horton's sister, Tanesha, and that Jackson was shot and killed during the commission of that crime. There were no known eyewitnesses to the shooting besides Scott, whom officers never interviewed. The State thus rested its case largely on circumstantial evidence, relying primarily on the testimony of the lead detective, Tim Fowler, and surveillance video from the Gateway apartment complex. What follows describes that evidence.

Booker Watson, Tanesha's friend, testified that on July 17, 2022, he went to Tanesha's home at Chelsea Plaza apartments in Kansas City, for dinner. When he arrived, Scott—Tanesha's ex-partner—was at the apartment and had a gun. Tanesha asked Scott to leave, but he would not go, and eventually their argument turned physical. Watson

2

called Tanesha's brother, whom he knew as T.J. At trial, Watson would testify that he believed T.J. to be Terry Horton. After Watson made this phone call, Scott took the phone and the gun and left.

After Scott left, someone came over in response to Watson's call. Watson believed the person was T.J. but was not certain because the person was wearing a black ski mask. Watson, Tanesha, and the man Watson believed to be T.J. decided to leave and try to find Scott so they could retrieve the phone. Tanesha took an AR-15 with her, and they used Tanesha's phone to track Watson's phone that Scott was carrying. At one point, they called Watson's phone and heard it ringing nearby. T.J. then split off from the other two. Shortly thereafter, Watson heard shots, and he and Tanesha ran off. T.J. eventually passed them, and the three got into Watson's vehicle. Watson drove T.J. to his car and Tanesha to her apartment. Tanesha collected some things from her apartment and followed Watson to his house.

On cross-examination, Watson did not remember initially telling detectives that after he arrived at Tanesha's apartment, one of Scott's girlfriends showed up and reported that there were people outside with guns who had a problem with them. He also did not remember whether he told detectives that Scott had gone outside with a gun and fired shots. He admitted that he was aware Tanesha had another brother named Terrell and that he was not aware Terry's second name was Dwon.

A security guard from the Chelsea apartments, Eddie Scover, also testified. He reported that he encountered Tanesha, a man, and a man in a mask on the night of the shooting. The group reported to Scover that someone had jumped Tanesha and run off with her phone, so they were trying to find the person. Scover denied remembering initially telling detectives that he recognized the man in the mask as Horton. He also admitted he was not testifying willingly.

The videos show three people walking through the Gateway apartment complex. Watson identified the three people as himself, Tanesha, and T.J. The person identified as T.J. was wearing a ski mask, a gray shirt, and light-colored bottoms. At one point, T.J. breaks apart from the other two and walks in the direction of where the victims were found. About 15 seconds later, people flee from the direction of the crime scene. The State theorized this was when shots rang out, but there is no sound to the video. About 7 seconds after that, T.J. flees from the direction of the crime scene. The State offered a still of the video in which T.J. is holding something as he flees. The State argued it was a handgun.

An officer who investigated the crime scene also testified. He reported that .40-caliber casings were located at the crime scene, which would be consistent with a handgun and not an AR-15.

Detective Fowler testified extensively for the State. He summarized his theory of the case and his investigative process. At two points during cross-examination, defense counsel attempted to elicit testimony from Fowler regarding Scott's statements to officers who first arrived at the crime scene. Scott allegedly told Officer Jonathan Tompkins that "[his] girl Tanesha" shot him and Jackson, and that she did it because Scott was cheating on her. Detective Fowler allegedly heard this information from Officer Tompkins and reported it in his affidavit to support the application to arrest Horton. The district court held the statements inadmissible as double hearsay.

Horton testified in his own defense. He reported that on the night of the shooting, he and his girlfriend met Tanesha at Grand Slam Liquor to give her some money. A surveillance video confirms this meeting and shows Horton wearing a gray shirt and light-colored bottoms. After leaving Grand Slam, Horton made some deliveries for Door

4

Dash with his girlfriend, went to McDonalds, and then went home. He testified that when they got home, he dropped his girlfriend and her daughter off and then drove to park the car. While he was parking the car, he received a call from Tanesha telling him that a man took her friend Watson's phone, but that she was okay. Horton then received a text from his girlfriend at 11:10 p.m. asking him what he was doing. He presumed she sent the text because he was taking too long to park the car. Horton's girlfriend testified and confirmed his account of the evening.

A jury convicted Horton of first-degree felony murder and aggravated battery. The district court sentenced him to a life sentence without the possibility of parole for 620 months for the felony murder conviction and a concurrent sentence of 29 months for the aggravated battery. Horton filed a timely notice of appeal.

ANALYSIS

1. *The district court made no error when it excluded certain hearsay statements.*

Horton argues the district court committed reversible error when it excluded statements that Scott allegedly made when officers arrived at the scene of the crime.

We review a district court's decision whether hearsay statements are admissible under a statutory exception for an abuse of discretion. *State v. Owens*, 314 Kan. 210, 220, 496 P.3d 902 (2021). "'A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.'" *Owens*, 314 Kan. at 221 (quoting *State v. Moore*, 302 Kan. 685, 692, 357 P.3d 275 [2015]).

5

"'Hearsay is '[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated.' K.S.A. 2020 Supp. 60-460. Hearsay testimony is inadmissible unless it fits within one or more of the K.S.A. 2020 Supp. 60-460 statutory exceptions." *State v. Evans*, 313 Kan. 972, 984, 492 P.3d 418 (2021).

Double hearsay, or hearsay-within-hearsay, is "an out-of-court statement [that] includes a statement made by another declarant" when "both statements are offered for the truth of the matter stated." *State v. Brown*, 285 Kan. 261, 279, 173 P.3d 612 (2007). Before a court may admit double hearsay, "each layer must be analyzed to determine its admissibility." *Owens*, 314 Kan. at 222 ("'A statement within the scope of an exception to K.S.A. 60-460 shall not be inadmissible on the ground that it includes a statement made by another declarant and is offered to prove the truth of the included statement *if such included statement itself meets the requirements of an exception*.'" [Emphasis added.]). In other words, a statutory exception must apply to each hearsay statement.

During trial, defense counsel sought to elicit testimony from Detective Fowler that Scott told Officer Tompkins that "[his] girl Tanesha" had shot him and Jackson because Scott had been cheating on her. The State objected, arguing that Scott's statements were inadmissible hearsay within hearsay that did not satisfy any statutory exception.

Horton responded that Scott's statement to Officer Tompkins was admissible through Detective Fowler because it was an excited utterance. See K.S.A. 60-460(d)(2) (making admissible a "statement which . . . was made . . . while the declarant was under the stress of a nervous excitement caused by such perception"). He acknowledged that it constituted double hearsay if it were to come in through Fowler, but he argued that did not make a legal difference.

6

The district court agreed Detective Fowler's testimony about Scott's comment would constitute double hearsay and, consequently, Horton needed to show that each statement—Scott's to Officer Tompkins and Officer Tompkins' to Detective Fowler—satisfied an exception to the hearsay rule. It also agreed that Scott's statement to Officer Tompkins was an excited utterance and would be admissible through Tompkins' testimony. But it ruled that Officer Tompkins' later recitation of the statement to Detective Fowler was not an excited utterance, so Horton needed to establish a different statutory exception to show its admissibility through Fowler. When Horton offered no other exceptions, the district court sustained the State's objection.

Later, defense counsel appeared to try another way to get Scott's statement into evidence through Detective Fowler when he asked Fowler how he received information about what the officers who first arrived on the scene observed. Fowler testified that those officers provided written reports. Defense counsel asked if Detective Fowler's first lead was Tanesha and if it was based upon those reports. Fowler replied that the officers on the scene gave him Tanesha's name based on something a person at the scene told them. When defense counsel asked if the person on the scene who offered that information was a victim, the State objected, arguing that issue had "been ruled on."

Defense counsel responded that the testimony would be "harmless" because at that point Detective Fowler had "testified that he got the report and reviewed the report."

The court sustained the objection and told the parties, "That's what I ruled on, so let's not go down that path anymore."

On appeal, Horton claims the district court ruled Scott's statement could come in through Officer Tompkins alone, and that this was error because it prevented "further exploration" of "alternative foundation through Fowler." He argues three different

7

hearsay exceptions permitted Fowler to testify about Scott's statement directly—prior written statements under K.S.A. 60-460(a), an affidavit under K.S.A. 60-460(b), and prior testimony under K.S.A. 60-460(c).

We reject Horton's claim. He mischaracterizes the district court's ruling as one that cut off his ability to assert a hearsay exception that would permit Detective Fowler to testify about Scott's statement. When the State argued that Detective Fowler's testimony about Officer Tompkins' description of what Scott told him would constitute double hearsay, Horton agreed but argued the excited utterance exception permitted that double hearsay. Horton could have, at that time, argued that it would not have been double hearsay or that a different exception applied. He offered neither, and so the district court sustained the State's objection. Horton's suggestion that the district court erroneously prevented that opportunity has no support in the record.

When the district court's ruling is characterized correctly, Horton's argument that he is entitled to relief because there were other applicable hearsay exceptions is meritless. This court has been clear that when a party seeks the admission of a hearsay statement, they "must provide the trial judge with a specific basis for the admission so the judge has a chance to fully consider whether the evidence should be admitted and to avoid any potential reversible error." *State v. Tague*, 296 Kan. 993, 998, 298 P.3d 273 (2013). When a party fails to do so, they are "'precluded from asserting the ground for the first time on appeal as a basis for error.'" *Tague*, 296 Kan. at 998 (quoting *State v. Haislip,* 237 Kan. 461, Syl. ¶ 5, 701 P.2d 909, *cert. denied* 474 U.S. 1022 [1985]).

The record makes it clear that Horton had the opportunity to assert any hearsay exception he thought applicable at the trial court. He failed to do so and, consequently, may not do so for the first time on appeal.

8

Horton offers a catch-all argument that the district court had to allow the statement's admission because it was exculpatory. But Horton cites no rule supporting the notion that anything that is exculpatory is admissible. In fact, the case he cites in support defeats his argument. He quotes *State v. Banks*, in which this court acknowledged that "[a] trial court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence that is an integral part of the theory of the defense." *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 1195 (2017). But it then cautioned that "[a defendant's] right to present [evidence in support of] a defense, however, is subject to statutory rules and judicial interpretation of the rules of evidence and procedure." *Banks*, 306 Kan. at 865.

As in *Banks*, the admission of this allegedly exculpatory evidence is subject to statutory rules, including prohibitions on admitting hearsay evidence that does not fit within an exception. Because Horton failed to advance a plausible exception below, the district court made no error in prohibiting Detective Fowler from testifying about Officer Tompkins' statement regarding what he heard Watson say.

2. *Sufficient evidence supported Horton's convictions for felony murder and aggravated battery.*

Horton moved for a judgment of acquittal after the State presented its case-in-chief, arguing there was insufficient evidence to support the charges. The court denied the motion. Horton renews this claim on appeal, arguing the evidence was insufficient to support both of his convictions.

"In a criminal case, when a defendant challenges the evidence's sufficiency to support a conviction, an appellate court examines the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the defendant

guilty beyond a reasonable doubt." *State v. Coble*, 312 Kan. 615, 626-27, 479 P.3d 201 (2021). This court will "not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021).

In considering sufficiency, this court has held "there is no distinction between direct and circumstantial evidence in terms of probative value" and that "'[a] conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *Colson*, 312 Kan. at 750 (quoting *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 [2016]). To be sufficient, circumstantial evidence "'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.' Instead, circumstantial evidence 'affords a basis for a reasonable inference by the jury' regarding a fact at issue." *Colson*, 312 Kan. at 750 (quoting *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 [2016]).

To prove felony murder in this case, the State needed to prove "the killing of a human being . . . in the commission of, attempt to commit, or flight from . . . aggravated battery . . . ." K.S.A. 21-5402(a)(2), (c)(2)(G).

To prove aggravated battery, the State needed to prove Horton "knowingly caus[ed] bodily harm to [Scott] with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 21-5413(b)(1)(B).

Horton concedes there was evidence Jackson was killed by gunshot wound. But he argues there was no *reliable* evidence that Scott was injured or, if he was, that Horton did it. Thus, he argues, the State did not prove the aggravated battery conviction or, consequently, the felony murder conviction which rested upon the aggravated battery. We disagree.

10

First, we conclude the evidence was sufficient to show that Scott suffered bodily harm. Watson testified Scott was at Tanesha's house on the night of the shooting, became physical with Tanesha, and left with Watson's phone. Photographs at the scene of the shooting show an area away from Jackson's body that is covered in blood. Detective Fowler testified the blood stains were from Scott. Next to the blood stains lay a phone that Fowler testified was later identified as Watson's phone. Fowler testified that Scott was found at the scene of the crime with gunshot wounds and was transported to the hospital where he underwent surgery and survived.

Second, we conclude the evidence was sufficient to show the bodily harm was inflicted with a deadly weapon. Fowler's testimony that Scott had gunshot wounds clearly supports this element. Furthermore, the person in the Gateway apartment video who allegedly shot Scott was holding what one could infer was a gun as he ran from the direction of the crime scene. Detective Fowler testified that based on his training and experience, he believed it was a handgun.

Finally, we conclude there was sufficient evidence Horton caused the harm and did it knowingly. Watson testified that a man he believed to be Horton came to Tanesha's house in response to a phone call informing him that Scott had hit his sister and that the three of them went to Gateway apartments to look for Scott. Surveillance video showed three people in the Gateway complex walking around. Watson identified them as himself, Tanesha, and Horton. The person identified as Horton was wearing a gray t-shirt and light-colored bottoms. Horton identified himself in an earlier video from Grand Slam liquor wearing a gray t-shirt and light-colored bottoms. Fowler testified that a security guard spoke to the three people and identified the third person to police as Horton. Watson testified that Tanesha called his phone, they heard it ringing, and then Horton split off from the group. Surveillance video shows Tanesha on the phone and the third

person walking away from Tanesha and Watson toward the direction of the crime scene. A few moments later, people are seen running from the direction of the crime scene. A few moments after that, the third person is seen running from the crime scene.

This evidence is all circumstantial. But circumstantial evidence can support a conviction, and the evidence here was sufficient to allow a reasonable juror to conclude Horton went looking for Scott, found him with Jackson, intentionally injured Scott with his firearm, and killed Jackson in the process.

Horton insists there was no supporting evidence for any of the aggravated battery elements besides Fowler's personal assessment of the evidence. He claims,

> "[H]ad Detective Fowler not testified to his personal conclusions, there would have been no evidence to identify Terry Horton as the third individual [in the video], no gun, and no other presumptions. The actual evidence, without Fowler's conclusions, is simply that three people were at the Gateway apartment complex, and during that time someone shot Printara Jackson."

Horton's argument ignores: (1) Watson's testimony; (2) the surveillance video from Grand Slam showing Horton in the same or similar clothes as the third person in the video; and (3) Detective Fowler's testimony that the security guard identified Horton as the third person in the video. It also mischaracterizes the evidence. While Fowler testified as to the inferences he made based on the evidence, the jury heard more than these inferences. It had before it all the pictures, the surveillance videos, and the testimony upon which Fowler made those inferences. The jury was free to accept or reject Fowler's conclusions and make its own.

Horton also claims that Fowler's testimony was unreliable and thus cannot support the convictions. But we do not assess reliability in considering the sufficiency of the

evidence. See *State v. Kesselring*, 279 Kan. 671, 679, 112 P.3d 175 (2005) (argument that evidence was insufficient because the only eyewitness was intoxicated "ignore[s] the applicable standard of review," because it is the jury's job to weigh evidence and determine credibility). Reliability is an admissibility question. See, e.g., *State v. Lyman*, 311 Kan. 1, 22, 455 P.3d 393 (2020) (explaining courts consider reliability of expert testimony before deeming it admissible).

Horton had the opportunity to object to the testimony's reliability when the State offered it at trial, but he did not. Horton was able to cross-examine Detective Fowler and poke holes in Fowler's testimony. He did this at length. His first question for Fowler was, "How do you know there wasn't more than one shooter there?" He went on to question how Fowler decided that Horton was the shooter when it was not on video and anyone could have come out of their apartment and fired their shots. He pointed out that Fowler had never spoken to Scott and Scott provided no testimony. From here, it was for the jury to determine whether Fowler's testimony was credible, not an appellate court's. *State v. Doyle*, 272 Kan. 1157, 1163, 38 P.3d 650 (2002) ("It is the jury's function, not [the appellate court's] to weigh the evidence and determine the credibility of witnesses."). The jury was free to accept or reject any of Fowler's conclusions.

In sum, the evidence, although circumstantial, was sufficient to support the aggravated burglary conviction. Consequently, it was also sufficient to support the felony murder conviction based upon that felony.

3. *Did the prosecutor err by misstating evidence and shifting the burden of proof?*

Next, Horton argues that the prosecutor committed prejudicial error by shifting the burden of proof and misstating the evidence.

In considering a claim of prosecutorial error, this court first assesses whether the prosecutor "stepped outside the wide latitude afforded [them] 'to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v. Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024) (quoting *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 [2022]). If this court finds error, it then considers whether that error was prejudicial under the constitutional harmless error test. Under this standard, the error is harmless "'if the State can demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *Coleman*, 318 Kan. at 303 (quoting *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 [2016]).

Horton argues this court can skip the first step of this analysis because he objected to every instance of error and the district court sustained each of his objections. He argues this establishes error and this court should not revisit that step because the State has not appealed those rulings.

The State disagrees; it contends the district court erred in sustaining the objections and urges this court to independently consider whether the prosecutor's comments were error. It points out that there is no statute authorizing its appeal from a conviction, so not only did it have no obligation to preserve its objection, it could not do so. See K.S.A. 22-3602 (authorizing State's appeal in criminal case in limited circumstances).

We agree with the State that this court can independently consider whether the prosecutor's statements were error. While the district court's rulings may lend support to Horton's position, he has offered no authority indicating they bar this court's independent review, especially when the State challenges the rulings in its appellate briefing. We thus move to the merits of his claims.

Horton contends the prosecutor erred four times. The first instance occurred during Horton's testimony. He testified that after the Door Dash deliveries, he and his girlfriend went to McDonald's and then went home. On cross-examination, the State pointed out that Horton did not report going to McDonald's before going home when he was originally interviewed by detectives. The State asked, "At any point since then, did you feel it important to tell the detectives where you were?"

Defense counsel objected, arguing the State was "switching the presumption of innocence" by insinuating Horton had a duty to come forward. The court sustained the objection, and the State abandoned the line of questioning.

The second instance came during closing argument, when the State pointed out that when Horton testified,

"he told you when he talked to detectives he never gave his girlfriend's name, he never gave the phone number, he never told them that he went to McDonald's afterwards because he didn't think it was important at the time. McDonald's has surveillance cameras. They could have looked at it if they'd been given that opportunity to say whether he was there or not. They could have gotten the Door Dash account, which he refused to give, and verified where he was at. But he refused."

Defense counsel objected. He argued the State was misstating the evidence because Horton did not refuse to do anything, he just did not know the information the detectives wanted and the State was shifting the burden of proof.

The court sustained the objection and instructed the jury as follows:

"The Court is going to instruct the jury to disregard the last statement of counsel. The Court is also going to remind the jury that statements made during closing are arguments

15

of counsel and to remember the evidence and what was testified from the witness box and from the witnesses. And the statements made by counsel are only argument."

The third instance occurred during the State's rebuttal, when the prosecutor told the jury:

"The evidence is there's a shooting. There's no doubt about that. The evidence is that Cedrick Scott was injured in a shooting. Again, there's no doubt about that."

Defense counsel objected because "there's no testimony he was shot," only that he was injured, and that the injury could have come from anything.

The Court sustained the objection and directed the State to rephrase. The State rephrased for the jury.

Finally, the fourth instance of alleged error occurred shortly thereafter. The prosecutor noted that no one knew Horton and his girlfriend's location immediately after they finished door dashing and asked, "[W]hat would have helped us figure that out, to prove definitively where he was?" He answered, "Door Dash account would have helped. Video from McDonald's would have helped."

Defense counsel objected and the court sustained the objection.

On appeal, Horton first argues that the prosecutor's questions and comments about Horton's failure to tell detectives he went to McDonald's shifted the burden of proof. We disagree.

"Prosecutors generally cannot suggest that a defendant has the burden to prove his or her innocence." *State v. Martinez*, 311 Kan. 919, 922, 468 P.3d 319 (2020). So a

16

prosecutor may not "cross-examine a defendant about the reasons why he did not provide his exculpatory statement to police once he was charged." *Martinez*, 311 Kan. at 922.

But the State correctly points out that the prosecutor was simply impeaching Horton's testimony with prior inconsistent statements. The State cites *State v. Falke*, 237 Kan. 668, 682, 703 P.2d 1362 (1985), in support.

In *Falke*, the defendant told arresting officers that he did not remember what happened during the crime because he was so intoxicated. But he offered new details at trial. The prosecutor asked him why he had not given the arresting officers the story he told at trial. The court held this was not improper because it did not offer a comment on the defendant's right to remain silent when the defendant *had not* remained silent—he had said he did not remember. The prosecution did not step outside its wide latitude when the prosecutor compared the trial statement with that prior inconsistent statement.

The prosecutor's comments here were like those in *Falke*. The emphasis was not on Horton's silence, but on his original statement that he went home after the Door Dash deliveries in comparison to the comment he made at trial—that he went to McDonald's before going home. In making those comments, the prosecutor did not step outside the wide latitude they are afforded in trying the State's case.

Second, Horton argues that the comment that he "refused" to tell investigators his girlfriend's name and her Door Dash account number and that he went to McDonald's misstated the evidence. He asserts that he did not "refuse" to offer the information; his testimony was that he simply did not know the information. He also argues the prosecutor misstated the evidence when he said there was no doubt that Scott was shot. Horton contends there is evidence that Scott was injured, but no direct evidence he was shot.

17

The State responds that these comments were not error because they were reasonable inferences based on the evidence.

"A prosecutor errs by arguing a fact or factual inference with no evidentiary foundation." *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021). But they may discuss inferences "reasonably drawn from" the evidence. *Coleman*, 318 Kan. at 302.

Again, the prosecutor made no error. There was evidence that Horton "refused" to give officers specific information. Fowler testified that Horton "did not want to give me" the girlfriend's Door Dash account number and would not give Fowler the girlfriend's name, even though Fowler asked. And Horton's own testimony at trial that he went to McDonald's before returning home supports an inference that he refused to give that information earlier when he originally left this detail out of his reports to detectives.

And there was evidence supporting an inference that Scott was shot. The trial evidence indicated Scott was injured and bled on the scene, that he was taken to the hospital and operated on, that a person running from the area of the crime scene was holding a handgun, that there were .40-caliber casings on the scene, and that the other victim at the scene suffered gunshot wounds.

In sum, none of the comments that Horton challenges amounted to error. Consequently, we need not move to the prejudice prong of a prosecutorial error analysis. We reject Horton's claim.

18

4. *Cumulative error did not deny Horton a fair trial.*

Horton argues that even if the trial errors are not individually harmless, they denied him a fair trial in the aggregate.

"The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances." *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). But "if none or only a single error exists, the cumulative error doctrine is inapplicable." *State v. Johnson*, 321 Kan. 357, 371, 580 P.3d 20 (2025).

Because we have held there was no error, Horton's cumulative error claim fails. We affirm Horton's convictions.

Affirmed.

LUCKERT, J., not participating.